Robert J. McKennon (SBN 123176) *rm@mckennonlawgroup.com*
Scott E. Calvert (SBN 210787) *sc@mckennonlawgroup.com*
**McKENNON LAW GROUP PC**
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone:  949-387-9595  |  Fax:  949-385-5165

Attorneys for Plaintiff Dalad Lertnitiwong

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| DALAD LERTNITIWONG,<br><br>                    Plaintiff,<br>vs.<br><br>LIFE INSURANCE COMPANY OF NORTH AMERICA, a Pennsylvania corporation; and DOES 1 to 10, inclusive<br><br>                    Defendants. | Case No.:<br><br>Action Filed:<br><br>Trial Date:<br><br>**COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES**<br><br>[Filed Concurrently with:<br> -   Civil Cover Sheet;<br> -   Summons; and<br> -   Certification of Interested Parties] |

**JURISDICTION AND VENUE**

1.      Plaintiff Dalad Lertnitiwong ("Plaintiff") brings this action against Defendant Life Insurance Company of North America ("LINA"), which administers claims on behalf of CIGNA, to recover benefits and to enforce and clarify her rights under section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. section 1132(a)(1)(B).  This Court has subject matter jurisdiction over Plaintiff's claim pursuant to ERISA section 502(e) and (f), 29 U.S.C. section 1132(e) and (f), and 28 U.S.C. section 1331.

2.      Venue lies in the Central District of California, Western Division pursuant to ERISA section 502(e)(2), 29 U.S.C. section 1132(e)(2), because Plaintiff resides in this District, some of the breaches alleged occurred in this District and the ERISA-governed plan at issue was administered in part in this District.

**THE PARTIES**

3.      Plaintiff is an individual who, at all times relevant to this action, was a citizen of the state of California and a resident of Los Angeles County, California, City of Gardena.  Further, at all times relevant to this action, Plaintiff was a participant, as defined by ERISA section 3(7), 29 U.S.C. section 1002(7), in the employee welfare benefit plan established by her former employer Sutherland Healthcare Solutions, Inc. (the "Plan"), which is at issue in this action.

4.      LINA, at all relevant times administered long-term disability ("LTD") benefits provided to Plan participants, including Plaintiff, by issuing group policy number LK963826 to Sutherland Healthcare Solutions, Inc. ("Sutherland

1   Healthcare").  That policy and the Plan promised to pay LTD benefits to Plaintiff

2   should she become disabled.  LINA, which operates under CIGNA, has acted as a

3   claims administrator and as an ERISA claims fiduciary of the Plan.

4

5        5.     Plaintiff alleges that LINA is, at all times relevant was duly authorized

6   to do, and is doing, business in Los Angeles County, California, within the Judicial

7   District of the Central District Court of California.

8

9        6.     The true names and capacities, whether individual, corporate, associate

10  or otherwise of the defendants named herein as DOES 1 through 10, inclusive, are

11  unknown to Plaintiff at this time, who therefore sue DOES 1 through 10 by fictitious

12  names and will ask leave of the Court to amend this Complaint to show the true

13  names and capacities of DOES 1 through 10 when the same are ascertained; DOES

14  1 through 10 are sued as principals and/or agents, servants, attorneys, and

15  employees of said principals, and all the acts performed by them were within the

16  course and scope of their authority and employment.  Plaintiff is informed and

17  believes and thereupon alleges that each of DOES 1 through 10 is legally

18  responsible in some manner for the events referred to herein, and directly and

19  proximately caused the damages and injuries to Plaintiff as hereinafter alleged.

20

21                   **FACTUAL BACKGROUND**

22

23       7.     Plaintiff began working for Sutherland Healthcare on or about

24  September 30, 2001.  At the time of her disability, Plaintiff was employed as a

25  "Medicare Medi-Cal A/R Billing Representative."  Accordingly to Sutherland

26  Healthcare's job description, Plaintiff was responsible for assisting medical

27  providers with collection of payments due for hospital service from the patient

28  and/or the payor.  The job required the ability to be organize, punctual and detail-

oriented, with a strong knowledge of Medicare regulations and provisions, along with ICD-9 and CPT codes.  While Plaintiff's job was sedentary in nature, it also required standing or walking for brief periods of time, and also required strong computer and communication skills, as well as the ability to troubleshoot problems as needed, maintain confidentiality and maintain a professional attitude at all times.

8.     Pursuant to the terms and conditions of the Plan, Plaintiff is entitled to LTD benefits because she met, and continues to meet, the Plan's operative definition of "disability" and the other conditions necessary to qualify for LTD benefits during the requisite time-period.  The Plan states that:

> The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:
>
> > 1) unable to perform the material duties of his or her Regular Occupation; and
> > 2) unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.
>
> After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:
>
> > 1. unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training, or experience, and
> > 2. unable to earn 60% or more of his or her Indexed Earnings.

9.     The Plan does not define "material duties."  However, "Regular Occupation" is defined as:

The occupation the Employee routinely performs at the time the Disability begins. In evaluating the Disability, the Insurance Company will consider the duties of the occupation as it is normally performed in the general labor market in the national economy.

10.     After twenty-four months of benefits – which for Plaintiff, would have occurred in October 2016 if LINA properly approved her LTD claim – the Plan requires that a claimant be:  "1. unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training, or experience, and 2. unable to earn 60% or more of his or her Indexed Earnings."

11.     Plaintiff's last day of work was December 13, 2013.  Plaintiff stopped working because the pain in her back and neck finally became so overwhelming that she could no longer perform the duties of her sedentary occupation.  After examining Plaintiff and her imaging reports, her physicians stated that she was unable to return to work, and recommended that she undergo back surgery to address and attempt to relieve Plaintiff's back pain caused by spinal stenosis, sciatica and related diagnoses.  In addition, Plaintiff experienced pain and weakness in her right shoulder.

12.     On or about December 23, 2013, Plaintiff filed a claim for short-term disability ("STD") benefits with LINA, which approved those benefits for the full 90 days that they were payable.  That is, from December 14, 2013 to March 14, 2014.  During this time, Plaintiff received $108.33 per month after the offset for State Disability benefits was applied.  (Plaintiff's receipt of California State Disability Insurance benefits ("CASDI") by the Employment Development Department continued for a year, until December 2014).

13.     On February 24, 2014 underwent spinal surgery performed by John Liu, M.D. at Keck Hospital of USC.  In the surgical documentation report, dated February 25, 2014, Dr. Liu noted that the surgery was performed because of Plaintiff's "ossification of the posterior longitudinal ligament with spinal cord compression and stenosis, T2, T3 and T4," a condition that remained after surgery. Specifically, during the surgery, Dr. Liu performed a "posterior decompressive laminectomy, inferior C7, Tl, T2, T3, T4, superior T5," "posterior instrumentation with pedicle screws and rods, Solera, C7, T1, T2, T3, T4, T5, " posterior arthrodesis with autograft/MASTERGRAFT at C7, Tl, T2, T3, T4, T5" and " intraoperative navigational guidance."

14.     Following the surgery, various imaging of Plaintiff's back and spine was performed to assess her condition.  A standing X-Ray of her spine for a scoliosis study, signed by Mark Shiroishi, M.D., revealed a "mild dextroconvex curvature of the lumbar spine noted centered at L2-L3," which was similar to a pre-surgery fining on October 24, 2013.  The X-Ray also revealed "diffusely decreased bone density," mild multilevel degenerative changes at L3-L4, L4-L5 and L5-S1, disc space narrowing, multilevel osteophytosis and mild bilateral SI joint degeneration.

15.     Following the surgery, Plaintiff did not experience a sudden relief of pain.  Her recovery from the invasive surgery was slow, which was to be expected given the invasive nature of her surgery and her advanced age.  Following the surgery, she was forced to were a cervical collar and undergo intense physical therapy.  She was also prevented from performing many activities around the house, much less the duties of her occupation.  In addition, her back surgery did not address the ongoing issues with her shoulder.

16.     On March 26, 2014, Plaintiff met with Leah Lovely, a physician's assistant at Keck Hospital of USC.  PA Lovely noted that Plaintiff "initially presented to Dr. Liu with complaints of worsening gait Instability, bilateral shoulder pain with radiation to her right upper extremity in a C6 dermatomal pattern, and right buttock pain with radiation down her right lower extremity," as well as "clumsiness with her hands" and "weakness."  It was noted that, following surgery, Plaintiff was "in and out of the hospital twice," and presented with "an altered mental state, with persistent nausea and vomiting."  Despite the surgery, Plaintiff complained of "continued gait instability," which required the use a front wheel walker.  On examination, Plaintiff was observed ambulating very slowly with a front wheel walker, and she was limited by extremity pain.

17.     Following the examination, PA Lovely believe that she should remain off work for at least another six weeks, a recommendation that Dr. Liu approved.

18.     After receiving STD benefits for 90 days, LINA converted Plaintiff's claim to a claim for LTD benefits.  Under the terms of the LTD Plan, Plaintiff was entitled to 60% of her basic monthly earning of $2,041.00, before offsets.

19.     On or about April 1, 2014, Plaintiff submitted claim forms in support of her claim for LTD benefits.  These forms included a Disability Questionnaire and Activities of Daily Living form.  On these documents, Plaintiff explained that she could not work because she needed help to moving around and completely daily tasks as the result of back pain and back surgery.  Plaintiff explained that she was taking six different medications, including carvedilol (for high blood pressure and heart failure), crestor (for high cholesterol), Glucophage (for diabetes), levoxyl (used to treat thyroid issues), trilipix (for high cholesterol) and val-diovan (for high

blood pressure and heart failure).  Finally, Plaintiff explained that she underwent spinal surgery on February 2014.

20.     LINA obtained records from Dianne Chung, M.D., who was treating Plaintiff for her history of hypertension, hyperlipidemia and hypothyroidism. However, during that examination, Dr. Chung noted that Plaintiff was recently hospitalized due to T2-T4 cord compression and cervical compression/degeneration. Dr. Chung noted that Plaintiff was still experiencing "a lot of pain" and was wearing a neck brace.  Dr. Chung also noted that Plaintiff was suffering from fatigue and malaise, and an examination revealed severe, chronic back pain.

21.     Dr. Chung also completed an LINA Medical Request Form, dated April 9, 2014, in which she noted that Plaintiff suffered from type-2 diabetes, memory issues, weakness and hypoglycemia.  She also noted that Plaintiff could not lift more than 10 lbs., needed breaks every few hours and could not stand, but was required to sit all of the time.  She also noted that Plaintiff's legs were shaking, and would need to be off of work for at least six more weeks.

22.     In May 2014, Plaintiff submitted to an MRI of her right shoulder, which showed tendinopathy (inflammation of the tendon), mild bursitis and "moderate degenerative changes [] within the acromioclavicular joint including capsular hypertrophy and marginal osteophyte formation."

23.     On May 13, 2014, Plaintiff completed a shoulder pain assessment as part of an evaluation, and stated that her pain was a 6 on a 1-10 scale.  She described the pain as sharp and shooting, and accompanied by numbness and tingling. Plaintiff noted that her pain increased at night and with overhead activities, and radiated into her arm.

24.     During this time, Plaintiff met with Dr. Liu about once a month for an evaluation of whether Plaintiff could return to work.  However, each month, Dr. Liu extended her disability for at least another month.  For example, during the May 29, 2014 visit, Dr. Liu noted that Plaintiff, for the first time would no longer need to wear a cervical collar, but needed to continue to work with a physical therapist.  Dr. Liu also noted that Plaintiff needed to see an orthopedic surgeon for a consultation related to her shoulder pain.

25.     During a June 5, 2014 evaluation of her shoulder, she reported that her pain worsened and was not a 7 on a 1-10 scale and was constant.  That same day, she met with George Hatch, M.D., who gave her an injection in her shoulder for the pain, and asked her to return in three months for a further evaluation to assess whether there was any improvement in her condition.

26.     On June 17, 2014, LINA sent a letter to Dr. Levee requesting updated medical records.  That same day, in response, Dr. Levee sent LINA a 21-page fax forwarding additional medical records that supported her disability.  This included records noting that Plaintiff was engaged in physical therapy to assist in the recovery from her back surgery, but because of her functional mobility deficits, she needed assistance at home and was unable to work.

27.     The medical records that Plaintiff provided to LINA clearly and overwhelmingly supported her disability.  Not only was her back pain so severe that she required back surgery, but following that surgery her condition did not improve such that she could return to work.  This fact was consistently confirmed by the medical records prepared by the physicians who actually examined Plaintiff, as well as the objective evidence presented in the imagine reports.  In addition, Plaintiff still suffered from shoulder pain, which further limited her functionality.   Unfortunately,

despite the overwhelming medical evidence supporting her disability, LINA decided to deny her ongoing claim for LTD benefits.

28.    Plaintiff was informed of LINA's decision in a letter dated August 20, 2014.  In the letter, LINA stated that it approved and paid her LTD claim through the date of the letter, but that the medical evidence in the file did "not support an ongoing physical or function impairment" that would prevent a return to work in her occupation as a Medical Billing Representative.

29.    LINA reported that her claim was reviewed by a LINA Associate Medical Director (Donald Minteer, D.O.) and Nurse Case Manager (Christine Hoffman), but who both agreed that the medical evidence did not support Plaintiff's claim that she could not return to work.  They believed that Plaintiff's "restrictions and limitations were unclear," despite the availability of the medical records that clearly detailed her pain and functional deficits.  The Associate Medical Director made no effort to speak with any of Plaintiff's treating physicians about their records and her disability.  While the Nurse Case Manager reportedly reached out to Plaintiff's physicians, she did not sufficiently follow-up to obtain their opinion, nor did she ask Plaintiff to ensure that her treating physicians spoke with LINA regarding her disability status.

30.    LINA's Associate Medical Director and Nurse Case Manager also concluded that Plaintiff's medical records did not include "objective, clinical exam findings or testing, imaging or documentation."  This statement was manifestly false.  There was objective evidence and those documents did exist in the form of MRI reports and examination notes.  Further, even if this were correct (it is not), the definition of disability does not require that an insured provide "objective" evidence

1   to support a disability claim.  Nor does it state that subjective complaints are

2   insufficient to support a claim.

3

4       31.     Courts have repeatedly ruled that claim administrators who, like LINA

5   here, require that a claimant provide objective evidence of a disability to support a

6   claim despite the absence of such language in the Plan "effectively imposes a new

7   requirement for coverage," in violation of ERISA which does not allow an insurer to

8   rewrite the Plan.  *See, e.g.*, *Saffle v. Sierra Pacific Power Co.*, 85 F.3d 455, 459-60

9   (9th Cir. 1996); *Hagerty v. Amer. Airlines LTD Plan*, 2010 U.S. Dist. LEXIS 91995,

10  *6 (N.D. Cal. Sept. 3, 2010).  Indeed, a claimant is entitled to rely on credible

11  subjective evidence in support of her claim.  *Montour v. Hartford Life & Acc.*, 588

12  F.3d 623, 635 (9th Cir. 2009) ("unreasonable for Hartford to require Montour to

13  produce objective proof of his pain level").

14

15      32.     Finally, while LINA's denial letter informed Plaintiff that she could

16  appeal the decision, in another violation LINA requirements under ERISA, LINA

17  failed to engage in a "meaningful dialogue" with Plaintiff and explain what

18  information she needed to provide to further support her claim.

19

20      33.     Plaintiff appealed LINA's claim denial decision by letter dated January

21  10, 2014.  In the letter, she stated that LINA's decision to deny her ongoing claim

22  based on the conclusion that she did not suffer from ongoing physical and functional

23  impairment was "false and premature."

24

25      34.     In her appeal letter, Plaintiff then provided a brief summary of her back

26  pain, which began in 2011, and eventually led to surgery and post-surgical physical

27  therapy.  Plaintiff noted that LINA stated that Dr. Liu's records indicated that she

28  did not have any work restrictions.  However, Plaintiff noted that this was incorrect,

1  and she continuously treated with Dr. Liu, and in November 2014 he confirmed that

2  "she is unable to carry on with some of her daily activities, let alone going back to

3  work."  Giving LINA the benefit of the doubt that the company never gave her,

4  Plaintiff noted there must have been some miscommunication between LINA and

5  Dr. Liu's office, and with her appeal provided updated medical records in support

6  over her claim.  This included, not only records from Dr. Liu, but also her physical

7  therapy notes and other additional medical information supporting her clam.

8

9      35.    LINA acknowledged receipt of Plaintiff's timely appeal by letter dated

10  January 22, 2015.  In the letter, LINA acknowledged receipt of Dr. Liu's medical

11  records from August to December 2014, an October 21, 2014 office visit note from

12  Dr. George Hatch (related to her ongoing shoulder pain) and physical therapy notes

13  from July to December 2014.  In these records, physicians who examined and

14  treated Plaintiff continued to conclude that she was disabled and unable to return to

15  work.

16

17      36.    For example, following an August 7, 2014 evaluation of Plaintiff, Dr.

18  Liu stated that she was disabled and could not return to work until November 2014,

19  as the earliest.  Indeed, Dr. Liu reported that she "finds it difficult to maintain her

20  head up" and is "significantly weaker in her paraspinous muscles" after wearing the

21  cervical collar and post-surgery.

22

23      37.    On October 21, 2014, Dr. Hatch noted that Plaintiff reported

24  experiencing pain in her neck, right shoulder and right arm.  He explained that

25  Plaintiff's June 2014 corticosteriod injection to treat the pain did not offer complete

26  relief, as she continued to experience "pain in her trapezius muscle bilaterally and at

27  the base of her cervical spine as well as the medial border of her scapula."  Dr.

28  Hatch noted that these reports of pain were consistent with her history of posterior

decompression and fusion for ossification of posterior longitudinal ligament ("OPLL") and severe spinal cord compression.  That same day, Dr. Hatch performed another injection, which provided a slight relief of her pain, but no change in the pain in her right trapezius muscle or at the base of her cervical spine. Dr. Hatch opined that arthroscopic surgery would not improve the pain any more than the injection.  He also recommended that she continue physical therapy.

38.     On November 6, 2014 Dr. Liu performed an X-ray on Plaintiff's spine, which revealed as exaggerated thoracic curvature of the spine, as well as a mild curvature of the lumbar spine at L2-L3.  The X-ray also revealed decreased bone density, mild multilevel degenerative changes at L3-L4, L4-L5 and L5-S1, disc space narrowing, multilevel osteophytosis, mild bilateral SI joint degenerative changes and mild atherosclerotic vascular disease.

39.     That same day, Dr. Liu prepared a report explaining that despite being eight months post-surgery, she still experienced a "significant amount of right trapezius paint that radiates in the upper shoulder area."  Dr. Liu noted that on examination "her pain is diffusely tender along the right trapezius into the rhomboids that prevents her from even driving and moving her neck."  Dr. Liu explained that Plaintiff "**is unable to carry on with some of her daily activities, let along going back to work**."  (Emphasis added.)

40.     Plaintiff also provided LINA with a series of reports from MRIs performed on December 11, 2014.

41.     First, Plaintiff submitted to an MRI of her cervical spine, without contrast.  In the resulting December 11, 2014 report, prepared by Anandh Rajamohan, M.D., noted that the MRI revealed "extensive ossification of the

1   posterior longitudinal ligaments from C7-T1 extending into the thoracic spine."  In

2   addition, the "craniocervical junction demonstrates mild degenerative changes."

3   The MRI also revealed that Plaintiff's "intervertebral discs are desiccated" and a

4   "minimal diffuse disc bulge" at C3-C4 and C4-C5.  The MRI also revealed "mild to

5   moderate degenerative changes are seen in the cervical and thoracic spine with areas

6   of anterolateral osteophytosis," as well as "mild degenerative vacuum disc change []

7   at C6-C7.  It was also reported that "ossification of the posterior longitudinal

8   ligament is partially visualized at T12 extending to L1 with narrows the spina canal"

9   and that "multilevel ligamentum flavum ossification/calcification in the cervical

10   spine" could indent the posterior sac at several levels.  Dr. Rajamohan also noted

11   that "trace atherosclerotic calcification is present."  Finally, Dr. Rajamohan also

12   noted that he could not evaluate any post-operative problems at C7 and T1-T4

13   because of fixed hardware.

14

15        42.    Dr. Rajamohan also prepared a December 11, 2014 for an MRI of

16   Plaintiff' thoracic spine, without contrast.  As with the cervical spine MRI, Dr.

17   Rajamohan noted that Plaintiff's fixed hardware from C7-T5 limited the evaluation.

18   However, he also noted that there was "extensive ossification of the posterior

19   longitudinal ligament from C7-T1 to at least T4-T5," as well as "ossification of the

20   posterior longitudinal ligament [] at T12-L1 and L1-L2," causing narrowing of the

21   spinal canal."  Dr. Rajamohan also observed mild to moderate degenerative changes

22   within the cervical and thoracic spine with areas of atherosclerotic calcification.

23

24        43.    Following the MRIs, Plaintiff was again seen by Dr. Liu.  In his report

25   dated December 11, 2014, he explained that while Plaintiff reported some post-

26   surgical improvement in her ability to walk and right arm pain, "she has a

27   tremendous amount of right trapezius area pain and [is] very tender to touch."  Dr.

28   Liu believed these symptoms were the result of "years of compression from her

1   [ossification of posterior longitudinal ligament]." Dr. Liu also noted that Plaintiff

2   experienced pain after standing for more than 30 minutes, and he expected it would

3   be at least six months before she began to see improvement from her daily exercise

4   and stretching program.  In conclusion, Dr. Liu assigned Plaintiff as Oswestry

5   Disability Index ("ODI") score of 62%(with 100% representing the maximum

6   disability possible), meaning Dr. Liu believed Plaintiff was "crippled" at that time.

7

8   44.   In January 2015, Plaintiff was awarded Social Security Disability

9   benefits of $850.00 per month.  LINA was provided a copy of the approval letter.

10

11   45.   Despite the overwhelming evidence supporting Plaintiff's claim for

12   ongoing LTD benefits, LINA informed Plaintiff, by letter dated March 6, 2015, that

13   it denied her claim based on a finding that "the medical documentation [and] the

14   available data does not support your reported symptoms and pain."  LINA further

15   stated that Plaintiff's "medical findings to not provide evidence for the severity of

16   your condition to explain your inability to perform full time work."

17

18   46.   In the denial letter, LINA listed some Plan terms and briefly

19   summarized a few select medical records.  Next, LINA summarized the reports

20   prepared by a "paper review" physician and a Vocational Rehabilitation Counselor,

21   and asserted that those reports supported the decision to deny Plaintiff's claim for

22   LTD benefits.

23

24   47.   The paper review physician hired by LINA, William Sniger, M.D.

25   confirmed in a February 20, 2015 report that Plaintiff's history of fusion surgery

26   limited her movement, and that she could not perform repetitive neck movements,

27   repetitive overhead reaching with her right upper extremity and could only

28   occasionally lift/carry up to 20 lbs. from floor to waist level.  Dr. Sniger also opined

1    that Plaintiff's "self-reports are out of proportion [to] the available data."  However,

2    Dr. Sniger offered this opinion without speaking to Plaintiff or her treating

3    physicians.  Nor did Dr. Sniger examine Plaintiff.  Instead, his report was based

4    entirely on a review of the medical records prepared by Plaintiff's treating

5    physicians, which did not contain the conclusions regarding Plaintiff's ability that

6    Dr. Sniger offered.  Indeed, there is no evidence as to how or why he reached his

7    conclusions.  His opinions were cursory and without any support and merely

8    rendered conclusions without any analysis.  Moreover, although Dr. Sniger suggests

9    that he reviewed all records in LINA's possession, it is not clear that he did not do

10   so it appears from the list of documents he reviewed that LINA did not provide him

11   with all of the material records in its file and that he therefore did not review

12   pertinent medical records.  Further, Dr. Sniger made no attempts to contact Plaintiff

13   or her physicians to discuss and better understand her medical conditions or her

14   restrictions and limitations.

15

16        48.    In light of all of the opinions of Plaintiff's physicians, it was improper

17   for Dr. Sniger to conclude, without any support, that Plaintiff was only limited to the

18   extent noted.  It was therefore unreasonable for Standard to rely on Dr. Sniger's

19   opinions to support its denial decision.

20

21        49.    In addition, it was improper for LINA to rely on Dr. Sniger's "paper

22   review" when this Court previously ruled that his opinions were not supported by

23   the available medical evidence and improperly relied upon to support a claim denial.

24   *See LaVertu v. Unum Life Ins. Co. of America*, 2014 WL 1224736 (C.D. Cal., Mar.

25   25, 2014).

26

27        50.    In the letter, LINA also explained that its Vocational Rehabilitation

28   Counselor, Melissa Mendez, opined that Plaintiff had sedentary work capacity, and

relied on that basis to uphold the denial of her LTD claim.  However, there are multiple problems with LINA's actions.  First, Mendez's report explicitly relied on the report of Dr. Sniger, however, as shown above, his opinion was inconsistent with Plaintiff's actual restrictions.  Second, while Mendez simply stated that Plaintiff had sedentary work capacity, she did not specifically state that Plaintiff could perform the duties of her occupation, which was required for LINA to properly conclude that Plaintiff was not entitled to LTD benefits.

51.     Further, while Mendez noted that "sedentary work involves sitting most of the time," the medical records indicate that sitting is beyond Plaintiff's capacity. For example, in Plaintiff's physical therapy note from October 29, 2014, the physical therapist Heather Morgenstern indicated that she had "impaired sitting, standing [and] ambulation tolerance."  Then in November 2014 and December 2014, Therapist Morgenstern noted that Plaintiff's "tolerance for unsupported sitting [was] limited to 15 mins; unsupported standing limited to 10 mins."

52.     The Ninth Circuit recently held that, where all of claimant's attending physicians agreed he could sit at most four hours per eight-hour workday, he was unequivocally disabled from performing his own sedentary occupation as a full-time controller (and from any other sedentary occupation), because sedentary jobs require mostly sitting and generally at least six hours per day.  *See Armani v. Northwestern Mutual Life Insurance Company*, 840 F.3d 1159, 1163 (9th Cir. 2016) (citing numerous cases that agree):

> Accordingly, these cases reflect the logical conclusion that an employee who is unable to sit for more than half of the workday cannot consistently perform an occupation that requires sitting for "most of the time." We agree with this commonsense conclusion and hold that an employee who cannot sit for more than four hours in an eight-hour workday cannot perform "sedentary" work that requires "sitting most of the time."

The *Armani* court held as much even though the insurer's medical consultants disagreed with the insured's attending physicians about the claimant's sitting limits. They concluded, based on reviewing his medical records, that the claimant had no sitting restrictions or limitations that would prevent him from performing a full-time sedentary job (when the insurer had contended sedentary work involves sitting most of the time). The Ninth Circuit placed **no weight** on the insurer's paper review opinions and, despite them, stated there was "*undisputed* evidence that . . . Armani was unable to sit for more than four hours a day" based on the attending physicians' opinions. *Id.* at *116 (emphasis added).

53. Thus, while LINA based its denial decision on the reports of Dr. Sniger and Vocational Rehabilitation Counselor Mendez, those reports did not properly support the decision to deny Plaintiff's claim.

54. Additionally, LINA's decision was deficient because LINA failed to ask Plaintiff to submit to an IME or other in-person evaluation, improperly requiring a heightened standard of disability, the failure to distinguish the finding by the STD claim administrator that Plaintiff was disabled at the time he stopped working in May 2014 and the failure to affirmatively distinguish Plaintiff's receipt of CASDI and SSDI benefits. LINA also, again, failed to clarify what sort of medical evidence, treatment or test results were necessary to prove Plaintiff's symptoms, or what functional effects were necessary or sufficient to show her impairments reached a level which was disabling is improper. Similarly, LINA again failed to provide Plaintiff with any details as to what medical documentation was missing or why the evidence in the record did not support her claim. Accordingly, LINA again failed to engage Plaintiff in a "meaningful dialogue" as required by *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666 (9th Cir. 2011).

55.     LINA's March 16, 2015 denial letter confirmed that Plaintiff exhausted her administrative remedies, and that, under ERISA, she was eligible to file a lawsuit seeking policy benefits and attorneys' fees.

56.     The proper standard of review is de novo.  LINA does not have discretionary authority pursuant to California Insurance Code Section 10110.6, and it erred in denying Plaintiff's claim.  California Insurance Code Section 10110.6 states in the relevant part:

> (a) If a policy, contract, certificate, or agreement offered, issued, delivered, or renewed, whether or not in California, that provides or funds life insurance or disability insurance coverage for any California resident contains a provision that reserves discretionary authority to the insurer, or an agent of the insurer, to determine eligibility for benefits or coverage, to interpret the terms of the policy, contract, certificate, or agreement, or to provide standards of interpretation or review that are inconsistent with the laws of this state, that provision is void and unenforceable.
> (b) For purposes of this section, "renewed" means continued in force on or after the policy's anniversary date.
> (c) For purposes of this section, the term "discretionary authority" means a policy provision that has the effect of conferring discretion on an insurer or other claim administrator to determine entitlement to benefits or interpret policy language that, in turn, could lead to a deferential standard of review by any reviewing court.
> ...
> (g) This section is self-executing. If a life insurance or disability insurance policy, contract, certificate, or agreement contains a provision rendered void and unenforceable by this section, the parties to the policy, contract, certificate, or agreement and the courts shall treat that provision as void and unenforceable.

57.     This section, by its own terms, applies to any policy or agreement that provides "disability insurance coverage" to "any California resident" regardless of where it was offered, issued, delivered, or renewed.  Here, no party disputes that Plaintiff is a California resident.  As such, this section applies to the Policy and Plan

1  at issue so long as they were offered, issued, delivered, or renewed after the

2  effective date of the statute, which is January 1, 2012, but before Plaintiff's claim

3  accrued.  *See Gonda v. The Permanente Med. Grp., Inc.*, 2014 WL 186354, at *2

4  (N.D. Cal. Jan. 16, 2014).  No party disputes that Plaintiff's claim accrued no earlier

5  than August 14, 2014, which is the date on which her claim for disability benefits

6  was first denied.  *See Grosz-Salomon v. Paul Revere Life Ins.*, 237 F.3d 1154 (9th

7  Cir. 2001) (holding that an ERISA cause of action based on a denial of ERISA

8  benefits accrues at the time benefits are denied).

9

10      58.     Thus, the only issue is whether the policy was offered, issued,

11  delivered, or renewed on or after January 1, 2012, but before August 20, 2014.  For

12  the purposes of section 10110.6, a policy automatically renews every year on the

13  policy's anniversary date.  *See* Cal. Ins. Code §10110.6(b) (providing that

14  "renewed" means "continued in force on or after the policy's anniversary date").

15  Here, the Policy became effective on January 1, 2014.  This means the Policy's

16  renewal date falls within the relevant time period, as the policy continued in force

17  through January 1, 2015 and renewed annually.  *See Gonda, supra* at 1093-1094;

18  *Polnicky v. Liberty Life Assur. Co. Of Boston*, 999 F. Supp. 2d 1144, 1148 (N.D.

19  Cal. 2013) (applying de novo standard of review to ERISA claim for denial of

20  benefits because "[t]he Policy was continued in force after its January 1, 2012

21  anniversary date, [so] any provision in the Policy attempting to confer discretionary

22  authority to Liberty Life was rendered void and unenforceable").  As such, any

23  grants of discretion that can be deemed to be a part of the Policy are void and

24  unenforceable, and thus, the denial of benefits at issue must be reviewed de novo.

25

26      59.     In a de novo review, "the burden of proof is placed on the claimant" to

27  establish entitlement to plan benefits.  *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d

28  1290, 1294 (9th Cir. 2010).  "When conducting a *de novo* review of the record, the

court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *Id.* at 1295-96.  The trial court performs an "independent and thorough inspection" of the plan administrator's decision in order to determine if the plan administrator correctly or incorrectly denied benefits. *Silver v. Executive Car Leasing Long–Term Disability Plan*, 466 F.3d 727, 733 (9th Cir. 2006).  De novo review permits the trial court to "evaluate the persuasiveness of conflicting testimony and decide which is more likely true." *Kearney v. Standard Ins. Co*., 175 F.3d 1084, 1095 (9th Cir.1999).

60.     Regardless of the standard of review this Court applies, LINA reached an incorrect decision given the ample medical evidence in support of Plaintiff's disability.  L:INA's denial letters failed to address the overwhelming medical evidence supporting Plaintiff's continued claim for disability benefits, improperly relied on flawed "paper review" reports, ignored Plaintiff's limitations and inability to perform a sedentary occupation, failed to offer "substantial evidence" of improvement after initially approving the claim, failed to distinguish the EDD's and SSA's determinations that Plaintiff was permanently disabled and failed to engage in a "meaningful dialogue" with Plaintiff regarding what additional medical evidence was needed to support her claim.  Accordingly, LINA conducted a biased claims investigation consistent with its inherent conflict of interest that failed to provide Plaintiff with a full and fair review of her claim, in violation of ERISA.

61.     Plaintiff is now, and at all times relevant, remained "disabled" as defined in the Policy, and has now and at all times relevant convincingly demonstrated her total disability through medical records and other documents, information, and correspondence.

62.     Standard's March 16, 2015 denial letter stated that Plaintiff exhausted her administrative remedies under the Plan and had the right to bring a legal action for benefits under ERISA section 502(a) following an adverse benefit determination on appeal.

### FIRST CLAIM FOR RELIEF

To Recover Benefits, Attorneys' Fees, Pre-Judgment and Post-Judgment Interest under ERISA Plan – 29 U.S.C. sections 1132(a)(1)(B), (g)(1)

(Plaintiff against LINA and Does 1 through 10)

63.     Plaintiff incorporates the previous paragraphs as though fully set forth herein.

64.     ERISA section 502(a)(1)(B), 29 U.S.C. section 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to her under the terms of a plan, to enforce her rights under the terms of a plan, and/or to clarify her rights to future benefits under the terms of a plan.

65.     At all relevant times, Plaintiff has been entitled to LTD benefits under the Plan.  By denying Plaintiff's claim for LTD benefits under the Plan, and by related acts and omissions, LINA violated, and continues to violate, the terms of the Plan and Plaintiff's rights thereunder.

66.     LINA failed to conduct a "full and fair review" of the claim denial, as required by 29 U.S.C. section 1133(2).  Thus, even if the Plan vests discretion in LINA to make benefit determinations, no deference is warranted with regard to LINA's handling of this claim.  *See Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1465 (9th Cir. 1997); *Jebian v. Hewlett-Packard Company Employee*

1  *Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003)

2  ("When decisions are not in compliance with regulatory and plan procedures,

3  deference may not be warranted.").

4

5      67.    A "prudent person" standard is imposed on ERISA fiduciaries.  *See* 29

6  U.S.C. §1104(a)(1)(b).  A "fiduciary" is also under a duty of loyalty and care to the

7  beneficiaries of the Plan.  *See* 29 U.S.C. section 1104(a)(1).  Under ERISA: (1) a

8  fiduciary must discharge its duties solely in the interest of plan participants and

9  beneficiaries and for the exclusive purpose of providing plan benefits to them; (2) a

10  fiduciary must act with care, skill, prudence and diligence; and (3) a fiduciary may

11  not act in any capacity involving the Plan, on behalf of a party whose interests are

12  adverse to the interests of the Plan, its participants, or its beneficiaries.  LINA's

13  handling of Plaintiff's disability benefit claim falls far short of these standards.

14

15      68.    For all the reasons set forth above, even if the proper standard of

16  review is abuse of discretion (it is not), the decision to deny disability insurance

17  benefits was arbitrary, capricious, wrongful, unreasonable, irrational, contrary to the

18  evidence, contrary to the terms of the Plan and contrary to law.  LINA abused its

19  discretion in deciding to deny this claim as the evidence shows its denial decision

20  was arbitrary and capricious.  Further, LINA's denial decision and actions heighten

21  the level of skepticism with which a court views a conflicted administrator's

22  decision under *Abatie v. Alta Health & Life Insurance Co.*, 458 F.3d 955 (9th Cir.

23  2006) and *Metropolitan Life Insurance Co. v. Glenn*, 544 U.S. 105 (2008).  LINA's

24  denial of Plaintiff's claim was erroneous and/or constitutes an abuse of discretion as

25  evidenced by, but not limited to, the following conduct:

26

27

28

Case No.:

- Ignoring the obvious evidence supporting Plaintiff's claim for LTD benefits, and instead combed the record and took selective evidence out of context as a pretext to deny Plaintiff's claim;

- Ignoring the opinions of Plaintiff's treating physicians, all of whom maintained that Plaintiff is unable to return to work. Deference should be given to these physicians' opinions as there are no specific, legitimate reasons for rejecting these physicians' opinions which are based on substantial and objective evidence in the claim file;

- Relying on a "paper review" conducted by an obviously biased physician who issued opinions contrary to Plaintiff's treating physicians, and who ignored their statements regarding Plaintiff's disability.  The paper reviewer made factual misstatements regarding Plaintiff's medical records, and ignored and downplayed the findings of Plaintiff's treating physicians regarding her functional limitations so as to reach a finding that she was not disabled;

- Relying on flawed vocational reviews which incorrectly determined Plaintiff was capable of work in her occupation, the physical requirements of which were beyond her abilities given the restrictions and limitations detailed by this treating physicians;

- Applying an extra-policy requirement of objective proof to deny Plaintiff her LTD benefits.  Such objective proof is not required under the Plan, and thus cannot be the basis on which to reject a

claim.  Standard also ignored objective proof of disability and mischaracterized Plaintiff's medical and other evidence;

- Making no effort to reconcile its decision to deny Plaintiff's LTD claim with her awards of STD benefits, CASDI benefits from the State of California and Social Security Disability Insurance benefits;

- Failing to make a "full and fair" assessment of claims and to clearly communicate to Plaintiff the "specific reasons" for her benefit denials;

- Failing to engage in a "meaningful dialogue" with Plaintiff. Standard was obligated to, but failed to, state in plain language what additional evidence it needed and what questions it needed answered so that Plaintiff could provide the additional material and information; and

- Failing to comply with ERISA's procedural requirements providing a full and fair review.

69.    As a direct and proximate result of LINA's denial of disability benefits, Plaintiff has been deprived of LTD benefits from and after August 21, 2014.

70.    As a direct and proximate result of the denial of her claim for LTD benefits, Plaintiff has been required to incur attorneys' fees to pursue this action, and is entitled to reimbursement of these fees pursuant to 29 U.S.C. section 1132(g)(1).

71.     A controversy now exists between the parties as to whether Plaintiff is disabled as defined in the Plan and therefore entitled to LTD benefits.  Plaintiff seeks the declaration of this Court that she meets the Plan definition of disability, and is entitled to benefits under the Plan.  In the alternative, Plaintiff seeks a remand to the claims administrator for a determination of Plaintiff's claim consistent with the terms of the Plan.

72.     Plaintiff alleges all of the same conduct against Does 1 through 10 as it does against LINA in this First Claim for Relief and in this Complaint.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that this Court grant the following relief against all Defendants:

1.     For all Plan benefits due and owing Plaintiff, including LTD benefits;

2.     For costs and reasonable attorneys' fees pursuant to 29 U.S.C. section 1132(g);

3.     For pre-judgment and post-judgment interest on the principal sum, accruing from the date the obligations were incurred.  *See Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 627 (9th Cir. 2007) ("A district court may award prejudgment interest on an award of ERISA benefits at its discretion."); *Drennan v. General Motors Corp.*, 977 F.2d 246, 253 (6th Cir. 1992).  Specifically, Plaintiff seeks interest at the rate of 10% per annum, pursuant to California Insurance Code section 10111.2; and

4.     For such other and further relief as this Court deems just and proper.



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  December 29, 2016                          McKENNON LAW GROUP PC

By: _____
    ROBERT J. McKENNON
    SCOTT E. CALVERT
    Attorneys for Plaintiff Dalad
    Lertnitiwong

Case No.: